IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RIO REAL ESTATE INVESTMENT
OPPORTUNITIES, LLC, a New Mexico
limited liability company,

       Plaintiff,

vs.                            Case Number: 1:12-cv-00758-JAP-ACT

TESLA MOTORS, INC., a Delaware
corporation,

       Defendant.

## FIRST AMENDED COMPLAINT FOR
## NEGLIGENT MISREPRESENTATION AND FRAUD

       **COMES NOW** Plaintiff, by and through its attorneys, Lastrapes, Spangler &
Pacheco, P.A. (By: Christopher M. Pacheco and LeeAnn Werbelow), and for its First Amended
Complaint states as follows:

### GENERAL ALLEGATIONS

       **1.**      Plaintiff Rio Real Estate Investment Opportunities, LLC, is a New Mexico limited
liability company and is duly authorized to transact business in Bernalillo County, New Mexico.

       **2.**      Upon information and belief, Tesla Motors, Inc. is a Delaware corporation duly
authorized to do business in New Mexico.

       **3.**      The Project (as hereinafter defined) which is the subject of this Complaint is
located in Bernalillo County, New Mexico.

       **4.**      This Court has jurisdiction over the persons and subject matter involved in this
dispute.

## FACTUAL ALLEGATIONS

5.      Plaintiff realleges and incorporates the allegations set forth in Paragraphs 1 through 4 as if fully set forth herein.

6.      Plaintiff, individually and by and through its related and affiliated entities, is the developer of certain real property located in Bernalillo County, New Mexico commonly known as the Cordero Mesa Business Park (the "Property").

7.      Throughout 2006 and 2007 Tesla chairman Elon Musk ("Musk"), Tesla employee Ron Lloyd ("Lloyd") and Tesla CEO Martin Eberhard ("Eberhard") (all acting as agents of Defendant) took substantial actions, engaged in numerous meetings and made a number of statements that Defendant was constructing a facility in Albuquerque, New Mexico in April 2007.

8.      On February 19, 2007, Musk and Eberhard, along with then Governor Bill Richardson, publically announced in Albuquerque, New Mexico that Defendant was going to construct a 150,000 square foot plant in Albuquerque and that construction of the plant would begin in April 2007.

9.      The announcement was made in releases to local media, at the Albuquerque Economic Development quarterly luncheon and elsewhere.

10.      At such time, Eberhard and Musk represented to Plaintiff that Defendant had selected the Property for the Project (defined below) and Plaintiff would construct the Facility (defined below).

11.      Musk, on behalf of Defendant, stated that although several locations had been evaluated, New Mexico and Albuquerque turned out to be the clear winners.

2

**12.**     On February 19, 2007, Plaintiff and Defendant entered into a Development Agreement dated February 19, 2007 (the "Development Agreement") (a copy of the Development Agreement is attached hereto as Exhibit A).

**13.**     The Development Agreement contains specific representations made by Defendant.

**14.**     The Development Agreement provided that Plaintiff was to construct (or cause to be constructed) a 150,000 square foot facility (the "Facility") for the manufacturing of electronic vehicles (the "Project").

**15.**     Defendant was to lease the Facility for a period of ten years.

**16.**     The agreed upon rental rate for the Facility was $1,350,000.00 annually with a two percent (2%) annual increase.

**17.**     The Development Agreement sets forth the rental amounts for the Facility and bonuses that were agreed upon for the Project.

**18.**     In reliance on the Development Agreement and the public and private statements made by Defendant (through its agents Eberhard and Musk), Plaintiff immediately acted to implement construction of the Facility and continued to do so in reliance on the initial and continued representations of Defendant.

**19.**     Plaintiff assembled a team consisting of an engineering/architecture firm, a general contractor and other subcontractors and developers that would be involved in the development, construction and ownership of the Facility (collectively the "Development Team").

**20.**     On February 28, 2007, Plaintiff held the first of numerous meetings to design and construct the Facility.  Ron Lloyd ("Lloyd") and Yannick Roux ("Roux") attended this meeting and employees/agents of Defendant.

21.     Plaintiff consistently held weekly or bi-weekly meetings with various members of the Development Team and employees of Defendant.

22.     Beginning in February 2007 and throughout 2007 employees of Defendant, including Lloyd and Roux, made regular trips to New Mexico and participated in the meetings with the Development Team.

23.     At least through June 2007, these meetings continued bi-weekly or more often.

24.     Specifically, Defendant attended at least the following meetings: February 28, 2007 (Roux and Lloyd); March 21, 2007 (Eberhard, Thomas, Roux and Lloyd); March 28, 2007 (Thomas, Roux and Lloyd); April 4, 2007 (Roux, Lloyd and Thomas); April 11, 2007 (Roux, Lloyd and Thomas); April 25, 2007 (Thomas, Lloyd and Roux); May 2, 2007 (Roux, Lloyd and Thomas): May 9, 2007 (Roux and Lloyd); May 16, 2007 (Roux); May 23, 2007 (Thomas, Lloyd and Roux); May 30, 2007 (Thomas, Lloyd and Roux); June 6, 2007 (Thomas, Lloyd and Roux); and June 13, 2007 (Thomas, Roux and Lloyd).

25.     At each of these meetings, Lloyd, Roux and the other present employees/agents of Defendant represented that Defendant was proceeding with the Project in New Mexico and Plaintiff was constructing the Facility.

26.     At no time did Defendant or any employee or agent of Defendant make a statement to Plaintiff that the Project was still in a conceptual phase, the Project location was still being determined or that all of the discussions were merely preliminary discussions.

27.     In reliance on Defendant's representations, Plaintiff and the Development Team conducted soil tests, obtained governmental approvals, designed and engineered parts of the Facility, assisted Defendant to obtain commitments for governmental funding, made numerous changes and revisions to plans for the Facility and otherwise satisfied those obligations under the

4

Development Agreement which it could complete prior to Defendant's election not to proceed with the Project in New Mexico.

    **28.**    Through 2007 and into 2008, Defendant continued its correspondence and interactions with Plaintiff regarding the Project and the specifications of the construction and development of the Facility.

    **29.**    As late as September 2007, Defendant, through spokesperson Daryl Siry, publicly confirmed through a press release Defendant's commitment to construct the Facility and proceed with the Project, but requested more time to decide on final manufacturing details such as vehicle options and production volume.

    **30.**    In January 2008, Defendant requested additional information from Plaintiff on fire protection systems for the Facility.

    **31.**    Despite Defendant's and its agents' numerous and specific statements and commitments to Plaintiff to proceed with the Project in the New Mexico and construct the Facility, throughout 2007 and in 2008, Defendant was evaluating locations outside of New Mexico for the Project and was actively negotiating with local and state officials in California to locate the Project in California.

    **32.**    On or around July 1, 2008, Musk, Ze'ev Drori and the then Governor of California made an announcement that Defendant would be locating the Project in California.

    **33.**    At the time of each representation made by Defendant or Defendant's agents and employees to Plaintiffs, Defendant knew that Defendant was still evaluating where to locate the Project and was pursuing agreements with the State of California to obtain incentives to locate the Project in California.

5

**34.**   Defendant's fraudulent conduct and misrepresentations caused Plaintiff to sustain substantial loss of revenues and profits and other general, special and consequential damages.

**COUNT I**
**NEGLIGENT MISREPRESENTATION**

**35.**   Plaintiff realleges and incorporates the allegations set forth in Paragraphs 1 through 34 as if fully set forth herein.

**36.**   Defendant represented to Plaintiff that it would construct and lease the Facility and operate the Project on the Property.

**37.**   Throughout 2007 and into 2008, Defendant engaged Plaintiff in substantial meetings and planning and Plaintiff engaged in such activities in reliance on Defendant's representations that the Project would be completed in New Mexico.

**38.**   After Defendant's failure to construct the Facility in accordance with the Development Agreement, Defendant, through its employee and agent Lloyd, continued to represent and warrant that it would review and address Plaintiff's and the Development Team's costs and expenses.

**39.**   These representations were false or misleading.

**40.**   It was foreseeable that Plaintiff could be harmed by incorrect or misleading statements regarding the Project and the Facility.

**41.**   Plaintiff reasonably relied upon the representations of Defendant.

**42.**   As a proximate result of Defendant's negligent misrepresentations, Plaintiff has suffered and will continue to suffer general, special and consequential damages.

6

## COUNT II
## FRAUD

**43.**    Plaintiff realleges and incorporates the allegations set forth in Paragraphs 1 through 42 as if fully set forth herein.

**44.**    The representations made by Defendant in the Development Agreement; the representations made by Defendant, through Musk and Eberhard, on February 19, 2007 in its public announcement; the representations made by Defendant, through Lloyd and Roux, at each of the planning meetings attended by Defendant; the representations made by Defendant, through Siry, as late as September 2007, and the other representations and statements set forth above that the Facility would be constructed and the Project located in Albuquerque when and even though Defendant was evaluating locations outside of New Mexico for the Project and negotiating with state and local officials in California to locate the Project in California constitute fraud.

**45.**    The actions of Defendant attending planning meetings; making changes and revisions to site plans; requesting additional design information and otherwise taking actions in furtherance of the representations made in the Development Agreement and construction of the Facility throughout 2007 and into 2008, while simultaneously evaluating locations outside of New Mexico for the Project and negotiating with state and local officials in California constitute fraud.

**46.**    The further action of Defendant intentionally concealing its intent to abandon the Project after over a year of assurances and perpetual preparation constitutes fraud.

**47.**    Defendant's actions were willful, wanton and in reckless disregard of the rights of Plaintiff.

7

**48.**     As a result of such fraudulent acts and representations, Plaintiff has suffered and continues to suffer substantial general, special and consequential damages.

**49.**     Plaintiff is entitled to punitive damages as a result of Defendant's fraudulent acts.

**WHEREFORE**, Plaintiff prays as follows:

A.     For a judgment against Defendant and in favor of Plaintiff for negligent misrepresentation;

B.     For a judgment against Defendant and in favor of Plaintiff for fraud;

C.     For an award of punitive damages;

D.     For attorney's fees and costs incurred by Plaintiff in this action; and

E.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

LASTRAPES, SPANGLER & PACHECO, P.A.

By:
     Christopher M. Pacheco
     LeeAnn Werbelow
     Attorneys for Plaintiff
     Post Office Box 15698
     Rio Rancho, New Mexico 87174
     Telephone: (505) 892-3607
     Facsimile: (505) 892-1864

## Development Agreement
## between Tesla Motors, Inc.
## and Rio Real Estate Investment Opportunities, LLC

### FEBRUARY 19, 2007

This Agreement contains the principal terms with respect to the relationship between Tesla Motors, Inc. ("Tesla") and Rio Real Estate Investment Opportunities, LLC ("Developer") and various affiliated parties indicated below. This Agreement will be governed in all respects by the laws of the State of New Mexico.

**Purpose**

This Agreement establishes a relationship between Tesla and Developer whereby Tesla will conduct certain of its operations at a facility located in Cordero Mesa Business Park, Bernalillo County, New Mexico, in exchange for certain economic incentives that have been outlined in a separate agreement between Tesla and the State of New Mexico ("State").

**Successor Agreement**

The parties contemplate that successor agreements will be drafted between Developer and Tesla that reflect the following terms and effect the relationship contemplated herein. However the parties agree that unless and until such agreement is signed, this Agreement represents the spirit of the overall agreement and a good faith commitment by the parties to perform the obligations described herein.

**Site**

Tesla will enter into a lease agreement with respect to that certain 150,000 square foot facility located in Cordero Mesa Business Park, Bernalillo County, New Mexico ("Facility") for a period of not less than ten (10) years. Tesla will use this facility for electric vehicle manufacturing, warehousing functions, and any other purpose, subject to terms and conditions that are outlined elsewhere in this agreement and in a separate agreement that has been created between Tesla and the State.

**Lease & Rent Waiver**

Developer has agreed to provide a ten (10) year lease for the Facility with rent to begin at $1,350,000 per year, increasing at 2% per year, based on Facility requirements provided by Tesla to Developer, and included with this agreement as Attachment A. Any modifications to the Facility may result in changes to these terms.

The first year's lease payments will be reduced by 50% each month. The is a NNN lease where Tesla pays all expenses. The lease term begins upon certificate of occupancy.

**Land Conveyance**

Developer will finalize an agreement with SunCal to convey, at no charge to Tesla, up to 75 acres of land which abuts the proposed site in Cordero Mesa. The conveyance of this land is contingent



**EXHIBIT**

_A_

upon a decision by Tesla to make a significant expansion onto the site. The 75 acres offered is based on the expectation of an expansion, where such expansion includes a factory and a test track. The expansion land will be conveyed on a formula of 3:1 ratio of land to factory square footage plus 15 acres for a test track. This expansion may occur in multiple phases over the life of the primary lease and its extensions. The intention of the parties is that various public entities and Developer(s) will pay for and provide utilities and infrastructure to the site at no cost to Tesla. It must be noted, however, that the parties of this date have no authority to obligate future local and state governments to any future commitments and expense.

**Signing Bonus**

Developer has agreed to provide a signing bonus to Tesla in the amount of $8,700,000. Payment of the signing bonus will be conditional upon Tesla meeting certain financial requirements to be agreed upon by the parties and described below, and conditional upon Bernalillo County's successful negotiation and implementation of a project participation agreement under the terms of LEDA as described below.

The signing bonus will be paid by Developer to Tesla according to the following schedule:

| | |
|---|---|
| July 1, 2007 | $750,000 |
| August 1, 2007 | 500,000 |
| September 1, 2007 | 650,000 |
| October 1, 2007 | 650,000 |
| November 1, 2007 | 650,000 |
| December 1, 2007 | 850,000 |
| January 1, 2008 | 650,000 |
| February 1, 2008 | 700,000 |
| March 1, 2008 | 3,500,000 |

The signing bonus will then be used by Tesla for the design and construction of vehicle prototypes, subsystem prototypes, lab tests, purchase of equipment in the Facility directly related to the assembly of vehicles, research and development.

**State Contribution**

As a contribution to the signing bonus described in the foregoing paragraph, the State will provide to Bernalillo County, pending appropriation by the New Mexico State Legislature, capital outlay totaling $7 million. The purpose of these funds will be to assist with economic development projects in Bernalillo County. Of these funds, $3.5 million will be provided from the 2007 session of the New Mexico Legislature, and $3.5 million will be provided from the 2008 session of the New Mexico Legislature.

Bernalillo County will use these funds, under the provisions afforded by the Local Economic Development Act (LEDA), to provide a direct grant to Developer to support the development of

land, building and/or infrastructure related directly to the Tesla project.

This grant shall be subject to the terms and conditions and state and local laws regarding LEDA, including the passage of the LEDA ordinance, development of an economic development plan, and approval by Bernalillo County of an economic development project application that must be submitted to Bernalillo County by Developer.

Bernalillo County and Developer will then enter into a project participation agreement that shall set out, at a minimum:
1. the contributions to be made by each party to the participation agreement;
2. the security provided to Bernalillo County and any performance guarantees;
3. a schedule for project development and completion, including measurable goals and time limits for those goals;
4. provisions for performance review and actions to be taken upon a determination that project performance is unsatisfactory.

**Contingencies**
The foregoing signing bonus from Developer, and the associated contribution from the State, is contingent upon sufficient funding in the development process by the City of Albuquerque, the County of Bernalillo, and State governments. The contribution will be further described in agreements between the applicable parties, and will include mutually agreeable performance benchmarks, such as capital investment, plant production levels and/or employment and wage levels. Execution of the signing bonus will be subject to review by Developer of Tesla's financial documents, including business plans and forecasts, as reasonably required by Developer.

**Representations and Warranties**
Each of the parties represent and warrant that any commitments made herein are made in good faith with the express and sincere intention to follow through as outlined herein. The State and other local governments will use their best efforts to provide any permits necessary for Tesla's intended use of the Facility and will use their best efforts to assist with approval of any applicable special needs variances. The State and other local governments will work with Tesla to ensure that Tesla is in compliance of applicable environmental laws or regulations.

**Approval of Use**
Developer will provide to Tesla a written statement from the City, County, or State that the proposed uses by Tesla of the Facility have been approved and are consistent with any applicable development plan, zoning, or any other restrictions on use.

**Absence of Certain Approvals or Consents**
Developer will provide to Tesla a written statement from the State and/or local government confirming that, to its knowledge, no discretionary approvals or permits are required by

Tesla to fully construct and operate the Facility, including, but not limited to, water or air quality approvals or permits, or sewer or water or other services or infrastructure, except those specifically identified.

**Absence of Additional Infrastructure**

Developer will provide to Tesla a letter, resolution or similar written statement from the County of Bernalillo confirming that, to its knowledge, no additional public infrastructure or service is required to operate the Facility as contemplated by the parties.

**Infrastructure**

The Developer will ensure that the site will be fully served with infrastructure, including utilities, for the proposed uses, including all improvements needed during the term of the primary lease and its extensions.

**Confidentiality**

All non-public information regarding Tesla (whether technical or otherwise) made available or disclosed by Tesla to Developer will be deemed "Confidential Information." Neither Developer or its agents (collectively, "Developer") will, without the prior written consent of Tesla, disclose to any third party or use any Confidential Information for any purpose other than evaluating or consummating the relationship contemplated herein. Confidential Information will not include (i) any information that is known by Developer at the time of disclosure or thereafter becomes known to the general public through no fault of Developer, (ii) is disclosed to Developer by a third party without any breach of any confidentiality obligation to Tesla, or (iv) is approved for disclosure by the prior written consent of Tesla. Tesla acknowledges that Developer will be required to publicly disclose certain details about its relationship with Tesla pursuant to applicable statutory requirements under New Mexico law. Developer agree to cooperate with Tesla to limit such disclosure in manner and content so as to preserve, to the maximum extent possible under applicable law, the confidentiality of the Confidential Information.

AGREED TO AND ACCEPTED BY:

Rio Real Estate Investment Opportunities, LLC

Name: Robin R. Dyche, CCIM
Title: Managing Member

Date: 2·19·07

TESLA MOTORS, INC.

Name: Elon Musk
Title: Chairman

Date: 2/14/07

Name: Martin Eberhard
Title: CEO

Date: 19 feb 07

# Attachment "A"

# Tesla White Star Vehicle Assembly Factory

Scope of work: This factory performs vehicle assembly from a pre-painted body. This includes the installation of all subsystems, chassis components, interior components, and drivetrain components from a variety of suppliers around the world. Assembled bodies come into this factory pre-painted, however, we will need a touchup line at the end of production to correct blemishes to the paint that occur in process.

Specifications:

Shell Size: approx 150,000 sqft +/-
Site Area: > 14 acres, > 300 parking spaces, and truck/trailer storage
Height: at least 20 ft clear, preferably 24 ft clear
Offices: Office space for 100 salaried employees in standard cubicles
Dock doors: > 14 dock doors, minimum 2 at grade
Power: 2000amps at 480V
Floor: Light manufacturing – at least 6" throughout. Able to withstand 5000lb vehicle loads
Water: TBD
Footprint: TBD. Maximizing the perimeter to floor area ratio is a plus for minimizing material transfer distances from dock to the assembly line
Lighting: Maximize use of natural lighting with skylights for the production floor
Efficiency: TBD

Anticipated Investment:

Fitup: $5,000,000
Capital: $5,000,000
Tooling: $10,000,000

Operational Strategy:

Two shifts, 5 days/week for 10,000 vehicles/year, with the ability to add a third shift and/or weekend shift to increase volumes up to 14,000 vehicles/year